IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

FREEMAN BELL,
    Petitioner,

vs.                                           Case No.  3:06cv265/LAC/EMT

DONALD BAUKNECHT, Warden,
    Respondent.
_____/

## REPORT AND RECOMMENDATION

    Petitioner, represented by counsel, initiated this action by filing a petition for writ of habeas corpus under 28 U.S.C. § 2241 (Doc. 1).  Respondent filed an answer (Doc. 14), and Petitioner filed a reply (Doc. 16).

    The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(B).  After careful consideration of the issues raised by Petitioner, it is the opinion of the undersigned that Petitioner is not entitled to relief.

I.    BACKGROUND

    Pursuant to a plea agreement filed in the United States District Court for the Middle District of Georgia, Petitioner entered a guilty plea on June 15, 2005, to one count of mail fraud in violation of 18 U.S.C. § 1341 (Doc. 1 ¶ 6).  The offense conduct occurred between April 10, 2002 and October 21, 2002 (*id*. ¶ 7).  On November 9, 2005, Petitioner was sentenced to twelve (12) months of imprisonment with credit for two (2) days of jail time, to be followed by three (3) years of supervised release (*id*. ¶¶ 9, 10).  According to the Bureau of Prison's (BOP) official calculation, Petitioner's sentence will expire on November 6, 2006 (*id*. ¶ 10).  That date is also his "projected release date," since he is ineligible to accumulate good conduct time due to the length of his sentence, pursuant to 18 U.S.C. § 3624(b) (*id*.).

Petitioner challenges the BOP's application of a policy regarding the portion of inmates' sentences that may be served in community corrections centers (CCC's). The policy change was prompted by an opinion issued by the United States Department of Justice, Office of Legal Counsel on December 13, 2002, which concluded that the BOP's prior practice of permitting an inmate to be eligible to serve the last six months of his sentence in a CCC, regardless of the total length of his sentence, violated 18 U.S.C. § 3624(c). The opinion prompted a procedural change by the BOP. Prior to December of 2002, the BOP permitted inmates to serve more than 10% of their sentences, but not more than six months, in CCC's. After the change, inmates were not permitted to serve more than 10% of their sentences in CCC's. This policy was promulgated as a formal rule effective February 14, 2005.[1]  28 C.F.R. § 570.21 (July 1, 2005).

Petitioner states that the staff at the Federal Prison Camp in Pensacola informed him that under the pre-10% Rule policy, Petitioner would have been transferred to a CCC at least three months prior to his projected release date (Doc. 1 ¶ 11). However, under the 10% Rule, Petitioner would not be transferred to a CCC until October 2, 2006, which is "exactly coincident" with his "10% date" (Doc. 1 ¶ 12).

Petitioner makes three arguments. First, the 10% Rule is contrary to the clear intent of Congress expressed in 18 U.S.C. §§ 3621(b) and 3624(c). Petitioner argues that § 3621(b) authorizes the BOP to transfer a prisoner to any available correctional facility, including a CCC, and requires the BOP to consider five enumerated factors in making transfer decisions; that the BOP's discretion over transfer of prisoners is subject to the obligation imposed by § 3624(c) to assure that prisoners serve "a reasonable part, not to exceed six months, of the last 10 per centum of the term" to be served under conditions that will afford the prisoner a reasonable opportunity to integrate back into the community; and that the BOP's construing § 3624(c) as restricting its authority under § 3621(b) to place prisoners in CCC's prior to their 10% date is a misconstruction of the statutes and contrary to Congressional intent (Doc. 1 ¶ 16.a.-d.). Second, Petitioner argues that the 10% Rule violates the Administrative Procedure Act (APA) because it is arbitrary and capricious. Petitioner

---

[1] In this report and recommendation, this court will refer to the policy change implemented in December of 2002 and promulgated as a formal rule in 2005 as the "10% Rule."

Case No: 3:06cv265/LAC/EMT

contends that in promulgating the 10% Rule, the BOP failed to acknowledge or address some of the comments submitted during the notice and comment period (Doc. 1 ¶ 16.e). Third, Petitioner argues that the BOP's application of the 10% Rule, which was effectively implemented by the BOP on December 13, 2002, to prisoners whose offenses were committed prior to that date violates the Ex Post Facto Clause (Doc. 1 ¶ 17).

II. ANALYSIS

    A. <u>BOP Rule Misinterprets Federal Statutes and Contravenes Congressional Intent</u>

Petitioner claims that the 10% Rule embodied in the December 2002 policy change and formalized in 28 C.F.R. § 570.21 is contrary to the clear intent of Congress expressed in §§ 3621(b) and 3624(c) and misinterprets those statutes. Petitioner urges this court to adopt the reasoning and conclusions of the First, Second, Third, and Eighth Circuit Courts, which have held that the BOP's interpretation of those statutes, embodied in the 10% Rule, is inconsistent with the plain meaning of those statutes. *See* <u>Levine v. Apker</u>, --- F.3d ---, 2006 WL 1901020 (2d Cir. July 10, 2006); <u>Fults v. Sanders</u>, 442 F.3d 1088, 1092 (8th Cir. 2006); <u>Woodall v. Federal Bureau of Prisons</u>, 432 F.3d 235, 245-46 (3d Cir. 2005); <u>Goldings v. Winn</u>, 383 F.3d 17, 28-29 (1st Cir. 2004); <u>Elwood v. Jeter</u>, 386 F.3d 842, 847 (8th Cir. 2004).

Two district court judges from this district have considered the BOP's interpretation of §§ 3621 and 3624(c) and concluded that it is not in conflict with the plain meaning of those statutes, and is a reasonable and permissible interpretation of those statutes. *See* <u>Conforti v. Bauknecht</u>, Case No. 3:04cv223/MCR/EMT (N.D. Fla. Nov. 30, 2004); <u>McCarroll v. Bauknecht</u>, Case No. 3:04cv126/RV/EMT (N.D. Fla. Oct. 6, 2004); <u>Sanders v. Wetzel</u>, Case No. 5:03cv183/MCR/EMT (N.D. Fla. Aug. 11, 2004). As discussed in those cases, principles of statutory construction instruct that the more specific statute, § 3624(c), operates as an express limitation on the more broad grant of authority set forth in § 3621. Thus, to interpret § 3624(c) as trumped by the general grant of authority in § 3621 would violate canons of statutory construction. Furthermore, § 3624(c) plainly sets forth time limitations concerning the length of time a prisoner may spend in a CCC, specifically, "a reasonable part . . . of the last 10 per centum of the term . . . not to exceed six months."

Finally on this issue, the 10% Rule does not explicitly or implicitly, theoretically or practically relieve the BOP of its obligation to consider the five factors enumerated in § 3621(b) for

making designation or transfer decisions. Indeed, in its response to public comments during the notice and comment period, the BOP expressly stated that it will continue to evaluate those statutory factors when making individual designations, and the 10% Rule would not adversely affect such individualized determinations. *See* 70 Fed. Reg. 1659, 1660 (Jan. 10, 2005). Therefore, this court concludes that the BOP's interpretation of §§ 3621(b) and 3624(c) as limiting the time Petitioner may spend in a CCC to the last 10% or less of his 12-month sentence does not run afoul of the plain meaning of the statues of Congressional intent, and is a reasonable and permissible interpretation of those statutes.

   B.  BOP Rule is Arbitrary and Capricious

  Petitioner next contends the 10% Rule violates the APA because it is arbitrary and capricious. Petitioner specifically argues that the BOP ignored the factual record, failed to address some of the issues raised in comments submitted during the notice and comment period, engaged in faulty reasoning, and failed to weigh the increased costs of the 10% Rule.

  Under the arbitrary and capricious standard of the APA, this court must give deference to the BOP's decision finalizing the 10% Rule by reviewing it for clear error and refraining from substituting its own judgment for that of the BOP. *See* <u>Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43, 103 S. Ct. 2856, 2866-67, 77 L. Ed. 2d 443 (1983); <u>Sierra Club v. U.S. Army Corps of Engineers</u>, 295 F.3d 1209, 1216 (11th Cir. 2002). The court's duty is to ensure that the agency took a "hard look" at the consequences of the proposed rule. <u>Sierra Club</u>, 295 F.3d at 1216 (citation omitted). An agency has satisfied the "hard look" requirement if it has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting <u>Motor Vehicle Mfrs.</u>, 463 U.S. at 43 (internal quotation omitted)). An agency's decision is deemed arbitrary and capricious under "hard look" review if it suffers from one of the following: "(1) the decision does not rely on the factors that Congress intended the agency to consider; (2) the agency failed entirely to consider an important aspect of the problem; (3) the agency offers an explanation which runs counter to the evidence; or (4) the decision is so implausible that it cannot be the result of differing viewpoints or the result of agency expertise." *Id.* (citing <u>Motor Vehicle Mfrs.</u>, 463 U.S. at 43). If such deficiencies occurred, this court may not rectify them or provide a

reasoned basis for the BOP's promulgation of the 10% Rule which the agency itself has not articulated; however, this court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Motor Vehicle Mfrs., 463 U.S. at 43 (internal quotation omitted). If the 10% Rule fails "hard look" review, it must be remanded to the BOP so that the agency may reconsider its own reasoning and decision. Sierra Club, 295 F.3d at 1216.

In the instant case, Petitioner identifies four points made by commenters that the BOP essentially ignored or addressed with faulty reasoning, thus rendering the decision to finalize the 10% Rule arbitrary and capricious. First, Petitioner asserts that in response to the BOP's assertion that its pre-10% Rule practices created a possibility of disparate treatment of similarly situated inmates, some commenters questioned the appropriateness of attempting to eliminate a potential for unintentional disparity in light of the absence of empirical evidence of actual disparities (*see* Doc. 2 at 18). Other commenters raised "length-of-stay" points (*id*. at 19-20). For example, one commenter stressed that in order to administer an effective reentry program, an inmate needs four to six months to prepare to return to the community, and that most transitional programming consumes approximately four months (*id*. at 19). Another commenter stated that the 10% limitation precluded the BOP from ensuring an adequate period of pre-release custody (*id*.). A third commenter stated that for many inmates, 10% or six months does not afford a reasonable opportunity to adjust to or prepare for reentry into the community (*id*.).

The BOP responded that in enacting § 3621(b), Congress codified its intent that the BOP not show favoritism in making designation decisions. *See* 70 Fed. Reg. 1659, 1660 (Jan. 10, 2005). Additionally, the BOP noted that eliminating unwarranted disparities in sentencing was a primary purpose of the Sentencing Reform Act of 1984. *Id.* The BOP stated that its pre-December 2002 policy created the possibility that it would unintentionally treat similar inmates differently; whereas the proposed rule promoted Congress' goal of eliminating disparities in the sentencing and handling of inmates and eliminated any concern that the BOP might use CCC placement to treat specific inmates or categories of inmates more leniently. *Id.* The BOP stated that it did not believe it needed empirical support for its statement that the pre-December 2002 policy created a possibility of disparate treatment, or the perception thereof, as the BOP made no assertion that the BOP had, in fact, treated inmates differently or shown favoritism, and it did not routinely engage in gathering

empirical data regarding prisoners' perceptions. *Id.* at 1661. Furthermore, the BOP's experience with inmates and their families and victims led it to conclude that placement in a CCC for reasons other than facilitating pre-release preparation may be perceived as diminishing the seriousness of the offense and promote the perception of such placement as favoritism. *Id.* The BOP emphasized again that the statute expressly prohibited favoritism. *Id.* With regard to the "length-of-stay" comments, the BOP responded that it "strives to prepare inmates adequately and appropriately for release into the community," and when inmates near the end of their term of imprisonment, it engages its "release preparation program" to help them reestablish or maintain community ties and otherwise reintegrate into the community. 70 Fed. Reg. at 1662. The BOP further responded that the 10% Rule was "consistent with Congressional judgments as to the appropriate and reasonable amount of time to be spent in pre-release custody" (*id*. (citing § 3624(c)).

Second, Petitioner argues that the BOP failed to address comments that the 10% Rule does not allow the BOP to consider facility resources in making designation determinations, including the fact that CCC's can be well-suited for the service of short sentences and that some prisoners need a longer time for adjustment than the 10% Rule allows (Doc. 2 at 20-21). The BOP responded that it concluded, based on its experience and a "closer look" at the particular characteristics and advantages of CCC's, that the resources of CCC's make them "particularly well suited" for placement of inmates during the last portion of their prison terms. 70 Fed. Reg. at 1660.

Third, Petitioner contends that the BOP stated in its publication of the proposed rule that the 10% Rule furthers Congress' determination that one of the important purposes of sentencing is deterrence of criminal conduct, but one commenter observed that the BOP never articulated concerns about deterrence during its history of using CCC's or as recently as December 2002, when it implemented the informal policy change. The BOP did not address this comment or the deterrence issue in its response to public comments.

Finally, Petitioner asserts that commenters raised the issue of the increased cost to the BOP as a result of the 10% Rule. The BOP acknowledged that the change would increase BOP costs, but stated that it balanced the cost against its interest in reaching a decision that more accurately reflected the BOP's mission, the text of § 3621(b), Congressional objectives, and the policy determinations of the United States Sentencing Commission. 70 Fed. Reg. at 1659-60. The BOP

also noted that it would be absorbing its own costs as necessary, and there would be limited economic impact on small businesses and virtually no impact on any other entity. *Id.* at 1660.

In sum, Petitioner contends that the BOP ignored the factual record, failed to address the reasoning of some commenters, engaged in faulty reasoning, and failed to weigh increased costs of the 10% Rule. Upon review of Petitioner's arguments and the administrative record, this court concludes that Petitioner has failed to show that the BOP's decision to finalize the 10% Rule suffered from any of the infirmities identified by the Eleventh Circuit and the Supreme Court as grounds for deeming it arbitrary and capricious and warranting remand to the agency. Therefore, Petitioner is not entitled to relief on this claim.

        C.        BOP Rule Violates Ex Post Facto Clause

Petitioner challenges the BOP's application of the 10% Rule to him on the ground that it violates the Ex Post Facto Clause. He contends that the criminal conduct underlying his conviction pre-dated the December 2002 change in BOP policy.

Article I, section 9 of the Constitution prohibits the federal government from enacting ex post facto laws. "One function of the *Ex Post Facto* Clause is to bar enactments which, by retroactive operation, increase the punishment for a crime after its commission."[2] Garner v. Jones, 529 U.S. 244, 249, 120 S. Ct. 1362, 1367, 146 L. Ed. 2d 236 (2000). The Supreme Court has held that this prohibition applies to statutes, rules and regulations governing administrative agencies, such as parole boards. *See* Garner, *supra*; California Dept. of Corrections v. Morales, 514 U.S. 499, 115 S. Ct. 1597, 131 L. Ed. 2d 588 (1995). Furthermore, the presence of agency discretion "does not displace the protections of the *Ex Post Facto Clause* . . ." Garner, 529 U.S. at 253. The controlling inquiry in cases examining parole laws is whether retroactive application of the law created "a sufficient risk of increasing the measure of punishment attached to the covered crimes." Morales, 514 U.S. at 509; *accord* Garner, 529 U.S. at 250 (controlling inquiry is whether the amended law "creates a significant risk of prolonging [the prisoner's] incarceration.").

---

[2]Although the Ex Post Facto Clause to which the Supreme Court referred in Garner is the Clause applied to the States, set forth in Article I, section 10 of the Constitution, the analysis of federal and state laws under the respective ex post facto clauses is the same.

Case No: 3:06cv265/LAC/EMT

The Eleventh Circuit applied this standard to an amended rule of the Georgia Parole Board in <u>Metheny v. Hammonds</u>, 216 F.3d 1307 (11th Cir. 2000), a case which is determinative of the ex post facto challenge in the instant case.  The plaintiffs in <u>Metheny</u> were inmates who were convicted under the Georgia recidivist statute which provided:

> [a]ny person who, after having been convicted under the laws of this state for three felonies or having been convicted under the laws of any other state or of the United States of three crimes which if committed within this state would be felonies, commits a felony within this state other than a capital felony must, upon conviction for such fourth offense or for subsequent offenses, serve the maximum time provided in the sentence of the judge based upon such conviction and *shall not be eligible for parole* until the maximum sentence has been served.

<u>Metheny</u>, 216 F.3d at 1308 (emphasis in original) (citing O.C.G.A. § 17-10-7(c)).  For more than forty years the Georgia Parole Board did not apply the statute because two Georgia Attorneys General had issued advisory opinions stating that the statute was an unconstitutional infringement on the Board's power and informing the Board that it was authorized to grant parole to recidivists convicted under the statute.  *Id.*  In 1994, the Georgia Supreme Court held that a similar statute did not violate the constitutional authority of the Board, and in the wake of this decision, the Georgia Attorney General issued an opinion stating that the Board's authority to grant parole to recidivists was limited by the statute.  *Id.* at 1309 (citing <u>Freeman v. State</u>, 264 Ga. 27, 440 S.E.2d 181 (1994)).  Thus, in 1995, the Board began applying the statute, redetermining parole eligibility of inmates sentenced under the statute, and denying parole to recidivists.  *Id.*  The Board's new procedure was codified in an amendment to the Board's administrative rules.  *Id.* at 1309 n.6.  In 1998, the Georgia Supreme Court held that application of the statute to recidivists sentenced prior to <u>Freeman</u> was constitutional.  *Id.* (citing <u>Moore v. Ray</u>, 269 Ga. 457, 499 S.E.2d 636, 637 (1998)).  When Metheny committed his crimes, the Board was not applying the statute and was granting parole to persons convicted under the statute.  Metheny was subsequently notified he was ineligible for parole.  *Id.*

In reviewing Metheny's ex post facto challenge to the Board's amended rule, the Eleventh Circuit assumed for purposes of analysis that the Board's change in its position on parole created "a sufficient risk of increasing the measure of punishment attached to the covered crime," because inmates sentenced pursuant to the recidivist statute would not be eligible for parole.  *Id.* at 1310.  However, the Circuit Court held that the new regulation did not violate the Ex Post Facto Clause

because the new regulation simply corrected an erroneous interpretation by an agency of a clear pre-existing statute:

> . . . the 1953 statute expressly took away from the Board the ability to grant parole to recidivists. The statute was clear: the Board had no authority to grant parole to recidivists. The Board's regulation about granting parole, when such regulation was clearly in conflict with the statute, was legally void: without any authorization in the law.
>
> In this case, the state law--the statute--has remained unchanged. The new Board regulation denying parole opportunities did not change the law. The new regulation was a correction. The new regulation corrected an erroneous interpretation by the Board of a statute which clearly and without ambiguity had always precluded the grant of parole to recidivists.

*Id.* at 1310-11 (footnote omitted).

In the instant case, the 10% Rule simply corrects the BOP's erroneous interpretation of a clear pre-existing statute, specifically, 18 U.S.C. § 3624(c).[3] The federal statute, section 3624(c), has remained unchanged. The BOP's new policy denying CCC placement to inmates until their "10% date" did not change the law, nor did it have the substantive effect of increasing the punishment for Petitioner's crimes.[4] The new policy was merely interpretive and corrective--it corrected an erroneous interpretation by the BOP of a statute which clearly and without ambiguity had always precluded designation to a CCC of inmates with more than 10% of their sentences remaining to be served.

---

[3] Because section 3624(c) is unambiguous, the BOP's new interpretation does not violate the Ex Post Facto Clause even if the BOP's prior interpretation was reasonable. *See* Metheny, 216 F.3d at 1310 n.11 (contrasting Knuck v. Wainwright, 759 F.2d 856, 858-59 (11th Cir. 1985) on the ground that Knuck involved an interpretation of an ambiguous statute).

[4] The cases in which other courts have determined that the change in policy had the substantive effect of retroactively increasing the petitioner's punishment, thereby violating the ex post facto prohibition, are those in which the petitioner relied on the old policy in deciding to plead guilty, the sentencing court relied on the old policy in calculating the sentence, or the petitioner had been designated or already placed in a CCC at the time of the policy change. *See* Schorr v. Menifee, No. 04 Civ. 1863(SHS), 2004 WL 1320898 (S.D.N.Y. June 14, 2004); Panchernikov v. Federal Bureau of Prisons, No. 04 Civ. 2531(RMD), 2004 WL 875633 (S.D.N.Y. Apr. 23, 2004); Crapanzo v. Menifee, No. 04 Civ. 1052(SAS), 2004 WL 736860 (S.D.N.Y. Apr. 5, 2004); Crowley v. Federal Bureau of Prisons, 312 F. Supp. 2d 453 (S.D.N.Y. 2004); Cato v. Menifee, No. 03 Civ. 5795(DC), 2003 WL 22725524 (S.D.N.Y. Nov. 20, 2003); Tipton v. Federal Bureau of Prisons, 262 F. Supp. 2d 633 (D. Md. 2003); Iacaboni v. United States, 251 F. Supp. 2d 1015 (D. Mass. 2003); United States v. Serpa, 251 F. Supp. 2d 988 (D. Mass. 2003); Byrd v. Moore, 252 F. Supp. 2d 293 (W.D. N.C. 2003). In the instant case, Petitioner pleaded guilty to the crime with which he was charged after the December 2002 policy change and the formal rule was promulgated, effective February, 2005; he was sentenced after those changes, and he reported to a federal correctional institution for service of his sentence after those changes.

Case No: 3:06cv265/LAC/EMT

Furthermore, Respondent submitted a sworn declaration of David A. Fagan, Case Management Coordinator at Petitioner's place of incarceration, stating that Petitioner's placement in a CCC was reconsidered under the BOP's old policy, without regard to the 10% limitation imposed by the December 2002 policy, and the agency determined that Petitioner would benefit from a 30-day placement in a half-way house for the following reasons:

> Mr. Bell has a relatively short sentence [12 months].  His overall institution adjustment has been good and he has maintained clear conduct.  Mr. Bell has been incarcerated for a relatively short period of time and has maintained community ties.  He has no prior criminal convictions, other than the current offenses, and he has a stable work history.  Mr. Bell has considerable post incarceration resources.  He was also relocated from the Middle District of Georgia and indicates he will reside in the Gainesville, Florida, area.  Mr. Bell has fewer transitional needs than most other inmates and will not need a long length of time in the RRC [formerly known as CCC] to seek employment and re-establish family and community ties.

(Doc. 14, Declaration of David A. Fagan ¶ ¶ 7, 9).  Therefore, Petitioner has failed to establish an ex post facto violation with regard the establishment of the date he will be transferred to a CCC.

Accordingly, it is respectfully **RECOMMENDED**:

That Petitioner's Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241 (Doc. 1) be **DENIED**.

At Pensacola, Florida, this 18th day of August 2006.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE  JUDGE**


### NOTICE TO THE PARTIES

**Any objections to these proposed findings and recommendations must be filed within ten (10) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon all other parties.  Failure to object may limit the scope of appellate review of factual findings.**  *See* **28 U.S.C. § 636;** <u>United States v. Roberts</u>**, 858 F.2d 698, 701 (11th Cir. 1988).**

Case No: 3:06cv265/LAC/EMT